UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LLOG EXPLORATION COMPANY, L.L.C.                    CIVIL ACTION

VERSUS                                               NO. 17-2323

FEDERAL FLANGE, INC., *et al.*                       SECTION M (4)

## ORDER & REASONS

Before the Court is a motion to dismiss for lack of personal jurisdiction filed by third-party defendant Silbo Industries, Inc. ("Silbo").[1]  Third-party defendant and third-party plaintiff CGP Manufacturing, Inc. ("CGP") opposes Silbo's motion to dismiss,[2] and Silbo replies in further support of the motion.[3]  Also before the Court is a motion to dismiss for lack of personal jurisdiction filed by third-party and cross-defendant R.N. Gupta & Company, Ltd. ("Gupta").[4]  CGP and third-party plaintiff Federal Flange, Inc. ("Federal Flange") oppose Gupta's motion to dismiss,[5] and Gupta replies in further support of the motion.[6]  Having considered the parties' memoranda and the applicable law, the Court denies the motions to dismiss for lack of personal jurisdiction.  This Court's exercise of specific personal jurisdiction over Silbo and Gupta (collectively "Defendants") comports with federal due process under the stream-of-commerce doctrine.

---

[1] R. Doc. 89.
[2] R. Docs. 102; 118; 150.
[3] R. Docs. 105; 157.
[4] R. Doc. 107.
[5] R. Docs. 120 (Federal Flange); 121 (CGP); 149 (Federal Flange Suppl.); 151 (CGP Suppl.).
[6] R. Docs. 127; 165.

## I.    BACKGROUND

This is a products liability case. Plaintiff LLOG Exploration Company, L.L.C. ("LLOG") is a Louisiana company "engaged in the exploration, development and production of oil and gas."[7] LLOG operates two wells located off the Louisiana coast on the outer continental shelf in the Gulf of Mexico.[8] In 2014, LLOG purchased four warrantied "6 x 6" target elbows from Federal Flange to install on its wells. The target elbows connected subsea piping at a 90-degree angle and maintained a flow path.[9] While in use, the target elbows cracked due to alleged non-apparent manufacturing defects.[10] LLOG shut down its operations to remove and replace the subsea target elbows which LLOG alleged resulted in millions of dollars of damage.[11]

The allegedly defective target elbows, originally manufactured as solid tee forgings (also known as shaped forgings or cushion tees, hereinafter "tees"), were imported or possessed by each of the parties in this case prior to LLOG's installing them on its wells. Gupta originally manufactured the tees, traceable by batch heat number H-3501, which were sold by Silbo to CGP, later machined, or hollowed out, by CGP, and then machine finished by Federal Flange into the target elbows at issue.[12] Gupta is a foreign manufacturer and exporter of forgings, flanges, and general engineering component parts, with its principal place of business in Ludhiana, Punjab, India.[13] Gupta's website publicizes that it exports its goods to the United States and that it manufactures forgings for various applications, including oil and gas.[14] Gupta does not limit or restrict where sales or distribution of its products could be made in the United

---

[7] R. Doc. 1 at 2.
[8] *Id.*
[9] R. Docs. 1 at 3-4; 89-1 at 2 n.2; 102 at 2 n.5.
[10] R. Doc. 1 at 4.
[11] *Id.* at 5.
[12] R. Docs. 58 at 2; 165 at 4.
[13] R. Docs. 107-1 at 7; 120-2 at 3.
[14] R. Docs. 120 at 3; 121 at 4; 120-3 at 3-4; 151 at 3.

States.[15]  While Gupta does not market or advertise to Louisiana, its representatives have visited at least one Louisiana customer on three or four occasions over the course of approximately 20 years.[16]  Between 2010 and 2012, Gupta sold approximately $10.2 million of its goods directly to purchasers in Louisiana, including over $2.4 million in sales of tees (or 105,892 tees), through its U.S. importer, Silbo.[17]

Silbo is an importer and supplier of "various carbon and stainless-steel pipe, tubing, fittings, forgings, flanges and other steel products."[18]  Silbo is incorporated under the laws of Delaware, with its principal place of business in Montvale, New Jersey.[19]  While Silbo sources its products from various foreign manufacturers, Gupta is Silbo's only manufacturer of the tees at issue.[20]  Silbo sells goods nationwide and neither limits nor restricts the states to which it direct its sales.[21]  Silbo claims that it does not advertise directly to Louisiana, but its representatives visit and call on Louisiana customers on occasion to foster business relationships and attempt to increase sales.[22]  Silbo readily admits it has done "substantial business" in Louisiana.[23]  Between 2010 and 2012, Silbo sold over $16 million in goods directly to at least six different Louisiana customers, including over $3.6 million in sales of tees (or 121,586 tees).[24]  Although Gupta and Silbo's import-export relationship is non-exclusive, they maintain "a long-term business relationship" and consistently conduct business in Louisiana,[25] including regular

---

[15] R. Docs. 149 at 3; 149-2 at 19-20.
[16] R. Docs. 149 at 2; 149-2 at 17, 20, 37.  Gupta admits that it sold goods to Silbo knowing that at least one of Silbo's customers was based in Louisiana.  R. Docs. 149-2 at 38; 151-1 at 10.  This Louisiana customer received regular deliveries of Gupta's goods through Silbo two to three times per month "over a period of years."  R. Docs. 149-2 at 38; 151-1 at 10.
[17] R. Docs. 149 at 2-3; 149-2 at 15; 151 at 5-6; 151-3.
[18] R. Doc. 157 at 2-3.
[19] R. Doc. 89-1 at 7.
[20] R. Docs. 149-1 at 19; 157 at 3.
[21] R. Docs. 150 at 3; 150-1 at 14; 157 at 3.
[22] R. Docs. 150-1 at 11, 14-16, 19-20; 157 at 2.
[23] R. Doc. 150 at 4, 10 (citing R. Doc. 137-2 at 3).
[24] R. Docs. 150 at 4; 150-2 at 5-10.
[25] R. Docs. 137-2 at 2; *see* 149-1 at 19.

distribution to at least one Louisiana customer, which Gupta representatives visited in Louisiana.[26]

In 2011, Gupta sold a bulk order of tees to Silbo, including the tees from heat number H-3501; Silbo then sold the tees to CGP, a Texas customer and manufacturer.[27] Gupta delivered the tees directly to CGP at its principal place of business in Houston, Texas.[28] In April 2014, Federal Flange ordered four target elbows from CGP, at which time CGP machined the tees bearing heat number H-3501 into target elbows and sold them to Federal Flange.[29] Federal Flange is a supplier and manufacturer of pressure connectors with a principal place of business in Texas.[30]

In June 2014, Federal Flange machine finished the four target elbows for its customer LLOG.[31] Before delivery, Federal Flange coordinated non-destructive testing on the four target elbows with G&S Non-Destructive Testing ("G&S") in Houston.[32] After testing, Federal Flange delivered the target elbows to LLOG, which alleges discovering defects in the elbows after their installation on its wells.[33]

LLOG filed an action against Federal Flange for (1) breaches of express and implied warranties, (2) breach of contract, (3) breach of the Louisiana Products Liability Act, (4) redhibition, (5) negligence, and (6) detrimental reliance.[34] Federal Flange filed a third-party

---

[26] R. Docs. 157 at 3; 165 at 2 (non-exclusive); 149 at 2; 149-2 at 17, 20, 37 (visit). *See supra* note 16.
[27] R. Doc. 165 at 4.
[28] *Id.*
[29] R. Doc. 58 at 2-3.
[30] R. Docs. 1 at 2; 4 at 6.
[31] R. Doc. 20 at 3.
[32] *Id.*
[33] R. Doc. 1 at 4-5.
[34] R. Doc. 1.

complaint against CGP, G&S, and Gupta for indemnification or contribution.[35]  CGP filed a

crossclaim against Gupta, and a third-party complaint against Silbo, for indemnification or

contribution.[36]  LLOG settled and dismissed its claims against Federal Flange on February 19,

2019.[37]  Only third-party claims remain in this action.

## II.    PENDING MOTIONS

Silbo filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for

lack of personal jurisdiction.[38]  Silbo argues that it is not subject to general or specific personal

jurisdiction in Louisiana, claiming it is not at home in Louisiana and none of its Louisiana

contacts are related to the instant litigation.[39]  Silbo further argues that jurisdiction does not

attach under a stream-of-commerce theory because: first, this theory did not survive the United

States Supreme Court's ruling in *Bristol-Myers Squibb v. Superior Court of California*, 137 S.

Ct. 1773 (2017); and, second, even assuming the theory remains viable, (i) the tees exited the

stream upon their delivery to CGP in Texas, and (ii) Silbo did not expect, or have specific

knowledge, that the imported tees would be distributed to a Louisiana end user.[40]

CGP opposes Silbo's motion to dismiss, arguing that Silbo is subject to specific personal

jurisdiction under a stream-of-commerce theory.  CGP states that Silbo imported the tees into a

regular stream of commerce intending to serve as broad of a market as possible without

restriction or limitation, aware that the stream may continue to an oil-and-gas-industry end user

---

[35] R. Docs. 9; 20.  Federal Flange also filed suit in Texas state court for indemnification or contribution.  R. Docs. 89-1 at 4. n.6; 89-2; 107-1 at 4 n.6.  The Texas action is currently stayed, pending the outcome of this case. Amended Order Regarding Pending Motions, *Fed. Flange, Inc. v. CGP Mfg., Inc.*, No. 2017-77289 (133d Jud. Dist., Harris Cty., Tex. Nov. 15, 2018).

[36] R. Doc. 58.

[37] R. Docs. 162; 164.

[38] R. Doc. 89.

[39] *Id.*  Defendants also contend in passing that the claims against them must be dismissed pursuant to a mandatory forum selection clause in the sales agreement between the parties.  R. Docs. 89-1 at 20 n.15; 107-1 at 20 n.13.  However, because the issues are not fully briefed, this Court addresses only the personal jurisdiction issues raised in Defendants' Rule 12(b)(2) motions.

[40] R. Docs. 89-1; 105; 157.

in Louisiana, where the stream did, in fact, deliver the allegedly defective tees, causing harm in the state.[41]

Gupta also filed a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction.[42] Gupta's arguments mirror Silbo's, contending that Gupta is also not subject to general or specific personal jurisdiction in Louisiana and that, assuming the stream-of-commerce doctrine is viable, Gupta did not have the requisite awareness that its tees would wind up in Louisiana to give rise to personal jurisdiction.[43]

Federal Flange and CGP each oppose Gupta's motion on the same grounds that CGP opposed Silbo's motion, arguing that specific personal jurisdiction attaches under a stream-of-commerce theory, wherein Gupta could foresee a Louisiana end user and the regular stream did, in fact, deliver the tees to Louisiana where they allegedly caused harm.[44]

CGP and Federal Flange requested jurisdictional discovery in their opposition briefs.[45] This Court ordered limited discovery primarily focused on whether Silbo or Gupta delivered the subject tees into the stream of commerce with an expectation or awareness that they would be purchased or used by consumers in Louisiana.[46] Following discovery, the parties filed supplemental briefs reasserting their positions on Defendants' motions to dismiss.[47] In CGP's supplemental brief opposing Silbo's motion, CGP outlined facts obtained through jurisdictional discovery regarding Silbo's Louisiana contacts and its knowledge about the nature of its sales and the market in Louisiana.[48] Specifically, CGP contends that Silbo had substantial sales in Louisiana, including $3.6 million in sales of tees, between 2010 and 2012; that Silbo knew that it

---

[41] R. Docs. 102; 118.
[42] R. Doc. 107.
[43] R. Doc. 107-1 at 1 n.1.
[44] R. Docs. 120; 121.
[45] R. Docs. 102 at 23; 118 at 8; 120 at 10; 121 at 24.
[46] R. Doc. 131 at 1.
[47] R. Docs. 149; 150; 151; 157; 165.
[48] R. Doc. 150 at 4-6, 10-12, 16-18.

did not sell to end users; that the tees Silbo imported from Gupta were used in the oil-and-gas industry; and that Louisiana is a known oil-and-gas market.[49]

In supplemental briefs opposing Gupta's motion, Federal Flange and CGP likewise outline Gupta's contacts with Louisiana and its knowledge about the nature of its exports and the Louisiana market.[50] Specifically, Federal Flange and CGP note that Gupta made over $10.3 million in sales in Louisiana between 2010 and 2012; that Gupta knew Silbo sold Gupta's oil-and-gas utilized products directly to Louisiana customers; and that Gupta representatives visited one such customer in Louisiana.[51] Further, Federal Flange and CGP contend that Gupta knew Louisiana to be an oil-and-gas industry leader and that Silbo did not sell its tees to end users.[52]

## III.   LAW & ANALYSIS

### A.  Personal Jurisdiction Standard

Federal Rule of Civil Procedure 12(b)(2) confers a right to dismissal of claims against a defendant where personal jurisdiction is lacking. Personal jurisdiction is "an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (internal quotation marks omitted). A federal court may exercise personal jurisdiction over a non-resident defendant if (1) the forum state's long-arm statute confers personal jurisdiction over the defendant, and (2) the exercise of personal jurisdiction comports with due process under the United States Constitution. *Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999). This case, involving alleged damage to wells located on the outer continental shelf adjacent to Louisiana, arises under the Outer Continental Shelf Lands Act ("OCSLA"). *See*

---

[49] *Id.*
[50] R. Docs. 149 at 1-3 (Federal Flange); 151 at 4-7, 10-12, 16-17 (CGP).
[51] *Id.*
[52] *Id.*

*Tenn. Gas Pipeline Co. v. Houston Gas Co.,* 881 F. Supp. 245, 250-51 (W.D. La. 1995), *aff'd,* 87 F.3d 150 (5th Cir. 1996). Under OCSLA, the law of the adjacent state applies in the absence of federal law. 43 U.S.C. § 1333. Therefore, the Court applies Louisiana's long-arm statute here because Louisiana is the adjacent state. *See Hughes v. Lister Diesels, Inc.,* 642 F. Supp. 233, 235 (E.D. La. 1986) (applying Louisiana's long-arm statute to an action arising under OCSLA because there is no federal long-arm statute); *see also Mote v. Oryx Energy Co.,* 893 F. Supp. 639, 642 (E.D. Tex. 1995) (observing that platforms on outer continental shelf "may be considered within the boundaries of the adjacent state for the purposes of determining where an accident 'occurred' for long-arm jurisdiction purposes"). Louisiana's "long-arm statute authorizes the exercise of personal jurisdiction to the limits of due process." *Choice Healthcare, Inc. v. Kaiser Found. Health Plan of Colo*., 615 F.3d 364, 365 (5th Cir. 2010). Hence, "the Court need only consider whether the exercise of jurisdiction in this case satisfies federal due process requirements." *Embry v. Hibbard Inshore, LLC*, 2019 WL 2744483, at *2 (E.D. La. July 1, 2019) (citing *Dickson Mar. Inc. v. Panalpina, Inc*., 179 F.3d 331, 336 (5th Cir. 1999)).

An individual's liberty interest is protected by federal due process through the requirement that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)). For purposes of personal jurisdiction, the due-process inquiry determines whether the defendant has purposefully availed itself of the benefits and protections of the forum state through "minimum contacts" with the forum, and whether the exercise of jurisdiction over the defendant "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Personal jurisdiction may be general or specific.  *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).  For a court to exercise general jurisdiction, the defendant's contacts with the forum must be "so continuous and systematic" as to render the defendant "at home" in the forum state.  *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  To exercise specific jurisdiction, a court must determine:

> (1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Seiferth*, 472 F.3d at 271 (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002)).  Upon establishing the first two factors, the burden then shifts to the defendant to demonstrate that an exercise of personal jurisdiction would be unfair or unreasonable.  *Burger King*, 471 U.S. at 477 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).  In determining reasonableness, a court considers "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief," *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987), as well as "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen*, 444 U.S. at 292.

A plaintiff need only present a *prima facie* case of personal jurisdiction when a court rules on a Rule 12(b)(2) motion without an evidentiary hearing.  *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008).  In resolving personal jurisdiction, the court may review "pleadings, affidavits, interrogatories, depositions, oral testimony, exhibits,

any part of the record, and any combination thereof." *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc*., 963 F.2d 90, 95 (5th Cir. 1992) (citing *Stuart v. Spademan*, 772 F.2d 1185 (5th Cir. 1985)). The plaintiff's uncontroverted allegations must be taken as true, and "conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985)). But a court is not required "to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp. v. Potomac Elec. Power Co*., 253 F.3d 865, 869 (5th Cir. 2001).

### B. The Stream-of-Commerce Standard

In a products liability action, a defendant's minimum contacts may be analyzed under a stream-of-commerce theory. The stream-of-commerce "doctrine recognizes that a defendant may purposely avail itself of the protection of a state's laws – and thereby will subject itself to personal jurisdiction – 'by sending its goods rather than its agents' into the forum." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig*., 888 F.3d 753, 778 (5th Cir. 2018) (quoting *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011)).

The appropriate standard under the stream-of-commerce doctrine divides the circuits. *Id.* at 778. The Fifth Circuit has long applied Justice Brennan's foreseeability standard, *see id.* (citing *Choice Healthcare,* 615 F.3d at 373), which reasons:

> As long as a participant in [the stream of commerce] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity.

*Asahi*, 480 U.S. at 117 (Brennan, J., concurring) (citing *Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081 (5th Cir. 1984)).  Therefore, under this standard, a plaintiff "need only show that [a defendant] delivered the product [at issue] 'into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state.'" *DePuy*, 888 F.3d at 778 (quoting *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 177 (2013)).

"The foreseeability required in the product liability context is 'not the mere likelihood that a product will find its way into the forum State.  Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Seiferth*, 472 F.3d at 273 (quoting *World-Wide Volkswagen*, 444 U.S. at 297); *see also Nicastro*, 564 U.S. at 888 (Breyer, J., concurring) (observing that a single isolated sale, alone, is insufficient to confer personal jurisdiction); *Burger King*, 471 U.S. at 475 (noting that a defendant's contacts must be more than "random, fortuitous, or attenuated, or of the unilateral activity of another party or a third person") (quotation marks and citations omitted); *Asahi*, 480 U.S. at 117 (Brennan, J., concurring) ("The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale.").

In support of their motions to dismiss for lack of personal jurisdiction, Defendants principally argue that *Bristol-Myers* sounded a "death knell" for the stream-of-commerce doctrine and urge this Court to begin the interment.[53]  However, this Court declines to follow the

---

[53] R. Docs. 89-1 at 17 n.13; 157 at 11 (citing Richard A. Dean & Katya S. Cronin, *The Last Nail in the Coffin of Stream-of-Commerce Personal Jurisdiction*, DRI FOR THE DEFENSE 22, 25 (Jan. 2018)).

lone, non-binding case[54] offered by Defendants in support of their position and instead adheres to long-standing and controlling Fifth Circuit precedent applying the stream-of-commerce doctrine. Indeed, the Fifth Circuit recently renewed its position on the stream-of-commerce doctrine in a case decided after *Bristol-Myers*. *See DePuy*, 888 F.3d at 778-79 (applying stream-of-commerce theory to confer personal jurisdiction over a parent company). Further, this Court has no trouble squaring the holding of *Bristol-Myers* with the Fifth Circuit precedent, particularly since the *Bristol-Myers* Court makes no mention of the stream-of-commerce doctrine.

In *Bristol-Myers*, the Supreme Court rejected a sliding-scale approach to specific jurisdiction in favor of concretely defining personal jurisdiction as either general or specific. 137 S. Ct. at 1781. The Court held that a California state court did not have personal jurisdiction over a non-resident drug manufacturer for claims by non-resident plaintiffs for harm that occurred outside the forum, despite the manufacturer's minimum contacts with the forum. *Id.* at 1782. Notably, the state court did exercise specific jurisdiction over the non-resident manufacturer with respect to claims brought by forum-resident plaintiffs because their harm occurred within the forum. *Id.* at 1779. This aspect of the case was uncontested by the parties. The non-resident plaintiffs in *Bristol-Myers* did not rely on the stream-of-commerce theory to support jurisdiction, but instead, hypothesized that "the more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim." *Id.* at 1778. The Court was never asked to address or discuss the stream-of-commerce theory, nor did it.

---

[54] *A.T. ex rel. Travis v. Hahn*, 341 F. Supp. 3d 1031, 1037 (E.D. Mo. 2018). Defendants also cite *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760 (3d Cir. 2018), contending that the Third Circuit indicated an "unwillingness to continue to apply the 'stream-of-commerce' doctrine going forward [post *Bristol-Myers*]." R. Doc. 157 at 10. But the Third Circuit states in *Shuker* that "[w]e thus have no cause to revisit our Court's precedent" on the application of stream-of-commerce theory to a manufacturer's parent company. 885 F.3d at 780. If anything, the Third Circuit's seamless citation of *Bristol-Myers* alongside its own precedent highlights that it did not believe *Bristol-Myers* to be the fatal blow to stream-of-commerce doctrine, as Defendants contend. *Id.*

Yet, Defendants argue that the *Bristol-Myers* Court's recitation of its own precedent is the proverbial nail in the stream-of-commerce coffin. Specifically, Defendants point to the Court's citation of one of its prior decisions for the proposition that "[f]or specific jurisdiction, a defendant's general connections with the forum are not enough. … [A] corporation's 'continuous activity of some sort within a state … is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" *Bristol-Myers*, 137 S. Ct. at 1781 (citing *Goodyear*, 564 U.S. at 927 (quoting *Int'l Shoe*, 326 U.S. at 318) (internal quotation marks omitted)). Defendants also note that "[e]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales." *Goodyear*, 564 U.S. at 930 n.6. But these propositions do nothing more than reinforce the fundamental distinction between general and specific jurisdiction – precisely the Court's objective in *Bristol-Myers*.

It is unclear how a clarification of this bedrock principle would now conflict with the long-standing stream-of-commerce doctrine built upon it. No party is advocating a sliding-scale approach to jurisdiction, asserting general jurisdiction, or arguing that general contacts alone suffice for personal jurisdiction here. CGP and Federal Flange contend that specific personal jurisdiction exists over Defendants because: Defendants placed their goods in a stream of commerce with an awareness that they could find their way to the forum; and, critically, these goods allegedly caused harm in the forum. *See Bristol-Myers*, 137 S. Ct. at 1779 (noting that specific jurisdiction over non-resident-manufacturer defendant was uncontested for resident plaintiffs whose harm arose in the forum). The second factor of the Fifth Circuit's three-factor test for specific jurisdiction provides that a defendant must have more than general connections with a forum, expressly requiring "the plaintiff's cause of action [to] arise[] out of or result[] from the defendant's forum-related contacts." *Seiferth*, 472 F.3d at 271. Under a stream-of-commerce theory, if goods injected into a stream of commerce reach a forum the defendant could

reasonably anticipate and cause harm, giving rise to litigation there, the requisite nexus exists between the defendant's contacts, the forum, and the litigation to confer specific jurisdiction, so long as exercise of jurisdiction is not unfair or unreasonable. *See DePuy*, 888 F.3d at 778 ("[A] defendant] may purposely avail itself of the protection of a state's laws – will subject itself to personal jurisdiction – 'by sending its goods rather than its agents' into the forum.") (quoting *Nicastro*, 564 U.S. at 882); *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006) ("[The Fifth Circuit] has consistently held that 'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.'") (quoting *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993)). This Court need not speculate about the demise of the steam-of-commerce doctrine because it is alive, well-settled, and governs today in the Fifth Circuit, having been reaffirmed once again in this circuit after *Bristol-Myers*. *See DePuy*, 888 F.3d at 777-81; *Ainsworth*, 716 F.3d at 176 (interpreting *Nicastro* and reaffirming the stream-of-commerce doctrine on the same day the Supreme Court decided *Goodyear*). With the applicable standard settled, this Court proceeds to apply the Fifth Circuit's stream-of-commerce precedent to the facts of this case.

## C. Specific Jurisdiction Analysis – Silbo

CGP relies on a stream-of-commerce theory in support of specific personal jurisdiction over Silbo; CGP does not contend that Silbo is subject to general jurisdiction. Thus, the Court addresses only specific jurisdiction.

### 1. Purposeful availment

Silbo is a self-professed nationwide seller and importer of tees.[55] Silbo sells tees without restriction or limitation on the states to which it directs its sales. Thus, Silbo directs "substantial"

---

[55] R. Doc. 157 at 3.

sales to consumers in Louisiana, to whom Silbo's representatives have made occasional sales visits and phone calls.[56]  Between 2010 and 2012, Silbo sold over $16 million in goods directly to at least six different Louisiana customers, including over $3.6 million in sales of tees (or 121,586 tees).[57]  The four distinct tees at issue, bearing batch number H-3501, were undisputedly imported by Silbo, travelled by way of Texas into Louisiana, and allegedly failed on a well off the coast of Louisiana operated by a Louisiana company.  A defect in the tees allegedly caused economic harm to LLOG, CGP, and Federal Flange.  Thus, CGP has made the necessary *prima facie* showing that Silbo delivered tees "into the stream of commerce with the expectation that [the tees] would be purchased by or used by consumers in the forum state." *Ainsworth*, 716 F.3d at 177.  It is reasonable to infer that Silbo expected or should have expected its tees would go to Louisiana because Silbo itself sold and delivered thousands of tees into this forum.  Such purposeful availment of a forum, in conjunction with an alleged product defect causing harm in the forum to a forum resident, gives rise to specific personal jurisdiction here.  *See DePuy*, 888 F.3d at 778.

Silbo argues that it did not control CGP's distribution nor did it possess specific knowledge about where and for what purpose CGP would resell the tees from batch number H-3501 three years after Silbo's sale to CGP.  The unique traceability of the tees at issue in this case, by batch number, should not muddy the stream-of-commerce analysis.  Analysis under the foreseeability test used by the Fifth Circuit does not turn on the likelihood that a particular good will make its way into the forum, "[r]ather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Seiferth*, 472 F.3d at 274.  "Minimum-contacts analysis is more realistic than mechanical, turning

---

[56] R. Docs. 150 at 3; 150-1 at 11, 14-16, 19-20; 157 at 2-3.
[57] R. Docs. 150 at 4; 150-2 at 5-10.

on matters of substance rather than form." *DePuy*, 888 F.3d at 779 (internal quotations omitted). The touchstone for stream-of-commerce analysis is not the defendant's specific knowledge, nor its control, nor a traceable route of the goods; instead, it is the defendant's purposeful availment of the forum through the stream of its goods rather than its agents. *See id* at 778; *World-Wide Volkswagon*, 444 U.S. at 297. Silbo need not have a particularized knowledge of the destination, or route, of each individual tee that it places into a stream of commerce in order to be subject to personal jurisdiction in a forum destination of one of its products said to be defective; indeed, many manufacturers and distributors do not have such a clearly traceable stream. *See Ainsworth*, 716 F.3d at 179 (holding the stream-of-commerce threshold is reasonable expectation rather than specific knowledge or control). The analysis turns on Silbo's direct or indirect conduct toward the forum market. *See World-Wide Volkswagon*, 444 U.S. at 297.

Silbo cannot, on the one hand, sell thousands of tees directly into the forum and then, on the other, claim it did not avail itself of the forum market or reasonably expect its tees to end up in the forum. Such an outcome would deprive a forum state of protection from defective products and subvert the purpose of the stream-of-commerce doctrine. That the allegedly defective tees at issue took a route through Texas should not strip Louisiana of the ability to protect its consumers against such products for harm occurring within the state. Silbo benefitted financially from the Louisiana market on a regular basis, both directly and through secondary markets. Deriving revenue from the forum as part of a nationwide sales or distribution stream of commerce is the "quid pro quo for requiring the defendant to suffer a suit in the foreign forum." *Choice Healthcare*, 615 F.3d at 373.

Silbo urges this Court to disregard its direct Louisiana sales in the contacts analysis. In doing so, Silbo misapprehends the significance of the evidence concerning Silbo's direct sales into Louisiana. The significance of this evidence is not that it itself establishes a pattern of

continuous and systematic contacts, which would be more relevant to a general-jurisdiction or fairness analysis; instead, the significance of the sales evidence is that it establishes the reasonableness of an inference that Silbo had or should have had an expectation that its tees would wind up in Louisiana so as to support the conclusion that Silbo should reasonably anticipate being haled into court there on issues related to its tees.

Nonetheless, even if the Court were to disregard Silbo's direct Louisiana sales, as Silbo urges, it is still reasonable that Silbo should have expected resale of its tees to consumers in Louisiana.  Silbo knew, as a nationwide seller that did not restrict or limit the distribution of its products into Louisiana (or any other state), that its tees would end up in a different state or country a "vast majority" of the time because it does not sell to end users.[58]  *See Bean Dredging*, 744 F.2d at 1082 (finding defendant's awareness that its products may go "virtually anywhere" in the stream of commerce was sufficient to prove awareness that product could end up in the forum).  Silbo had first-hand knowledge that there was a market for tees in Louisiana because it sold thousands of tees directly to customers in the state.  Further, Silbo knew that tees were used in the oil-and-gas industry because it knew that its Louisiana client, to which it sold thousands of tees, was in the oil-and-gas business,[59] and that its largest market is Texas "mostly" owing to the oil-and-gas industry there.[60]  Moreover, Louisiana is a well-known oil-and-gas industry leader.[61] *Cf. Ainsworth*, 716 F.3d at 179 (observing that Mississippi's status as the fourth largest poultry-producing state in the country was a significant factor in assessing manufacturer's reasonable expectation that a poultry-specific forklift would end in Mississippi when selling the product nationwide).  It appears disingenuous for a tubular steel company to claim it would not

---

[58] R. Doc. 150-1 at 5-7, 12-13.
[59] *Id.* at 10.
[60] R. Doc. 149-1 at 4.
[61] This fact was known even by Silbo's international-manufacturer, Gupta.  R. Doc. 149-2 at 23.

reasonably expect its products to end up in an oil-and-gas-industry-leading forum when it distributes its oil-and-gas-utilized products nationwide without restriction. To be sure, it would seem financially imprudent to ignore such a market, and it would be unreasonable to expect manufacturers in a neighboring oil-and-gas state to likewise ignore such a market when selling the company's products without any restriction or limitation. Thus, it was foreseeable that the tees Silbo sold to CGP would find their way to states outside Texas and it was foreseeable that one of those states would likely be Louisiana given the amount of business Silbo itself conducted directly in Louisiana, Louisiana's status as an oil-and-gas producing state, and the tees' predominant use in oil-and-gas applications.

Silbo further argues that the stream of commerce carrying the tees ended upon their delivery to CGP, either because Silbo turned over possession of the tees or because the tees were machined by CGP, thereby creating a "new" product. Both arguments are unavailing. Courts have repeatedly held that component parts travel through streams of commerce and production until they reach an end user. *See, e.g.*, *Asahi*, 480 U.S. at 106 (tire valves); *Bean Dredging*, 744 F.2d at 1082 (steel casting component parts); *Istre v. Montco Offshore, Inc.*, 2016 WL 1110227, at *3 (E.D. La. Mar. 22, 2016) (citing *Seiferth*, 472 F.3d at 273) (observing that "[t]he stream of commerce generally ends where the product is purchased by the end consumer," and finding that the stream of commerce for a "switch" component part began at the original manufacturer in Indonesia, traveled through a distributor in France and a regional distributor in Hungary, was eventually sold to a Czech corporation and installed into a winch system, which was sold to an Alabama company, and finally, the winch system was installed onto a vessel, ending the stream). Here, the stream of commerce began when Gupta sold its tees to Silbo; Silbo then sold the tees to CGP in Texas; CGP thereafter sold the machined tees to Federal Flange, which machine finished them, tested the tees with G&S, and then sold the tees to a Louisiana end user, LLOG, where the

tees exited the stream. It strains credulity to believe that Silbo did not have an expectation that the tees it delivered into the stream of commerce in an unfinished state to a Texas distributor might be sold or resold to an end user in Louisiana who was involved in the oil-and-gas industry. The evidence establishes that Silbo's conduct and connections with Louisiana are such that it should have reasonably anticipated being haled into court there.

Silbo well understood its position in a stream of commerce which it helped to feed. Silbo's vice president, Alan Shalom, stated in his deposition that Silbo does not sell to end users and that Silbo is aware its products end up in other states and other countries "a vast majority of the time."[62] Additionally, Shalom understood that Silbo sold unfinished products that are machined by other manufacturers and resold for many different applications.[63] Even with the knowledge that its goods travel to many forums, Silbo took no action to restrict or limit its sales in any way – for example, by barring their sale or distribution into Louisiana.[64] *See World-Wide Volkswagon*, 444 U.S. at 297 (observing that a defendant can "act to alleviate the risk" of litigation if it desired by imposing restrictions or limitations on the distribution of its products).

Although Silbo did not control the distribution chain, Silbo did import the tees into the stream of commerce. It was this conduct, not the actions of CGP or other distributors, that subjects Silbo to personal jurisdiction in this forum. Control of the stream or distribution chain is not required for personal jurisdiction. *See Asahi*, 480 U.S. at 121 ("[A]lthough [defendant] did not design or control the system of distribution that carried its [product] into [the forum, defendant] was aware of the distribution system's operation, and knew it would benefit economically from the sale in [the forum] of products incorporating its components.") (internal quotations omitted); *Verde v. Stoneridge, Inc.,* 2015 WL 1384373, at *4 (E.D. Tex. Mar. 23,

---

[62] R. Doc. 150-1 at 6-7, 12-13.
[63] *Id.* at 2-6.
[64] *Id.* at 14.

2015) ("A manufacturer of a component part is not insulated from specific jurisdiction merely because the component part manufacturer does not control the distribution process.") (citing *Bean Dredging*, 744 F.2d at 1085). Even without considering Silbo's direct sales to Louisiana as contacts, Silbo's knowledge about the nature of its sales and the available market in Louisiana evinces a reasonable awareness and expectation that its tees would end up in Louisiana.

Silbo's conduct of placing its tees in regular streams of commerce and purposefully availing itself of the forum provided it sufficient notice that it may be haled into a Louisiana court to defend itself if one of its tees caused harm there. Silbo's products reached Louisiana by a regular stream of commerce intended to serve as broad of a market as possible,[65] rather than by unilateral acts of a consumer, "unpredictable currents or eddies," *Asahi*, 480 U.S. at 117, or by the "fortuitous or attenuated contacts" of a third party, *Burger King*, 471 U.S. at 475 (internal quotations omitted).

### 2. Connection to Forum-Related Contacts

The Court next examines whether the cause of action arises out of or results from the defendant's forum-related contacts. In doing so, this Court is cognizant of the Supreme Court's caution in *Bristol-Myers* that a "corporation's continued activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suit unrelated to that activity." 137 S. Ct. at 1781. Here, the evidence of Silbo's contacts with Louisiana does not constitute "continuous activity" unrelated to the suit. Given the unique traceability of the tees at issue in this case, by batch number H-3501, it is undisputed that Silbo's contacts with Louisiana – its insertion of the tees into the stream of commerce – are related to LLOG's claims that Silbo's allegedly defective tees caused harm in Louisiana. And, it is this stream of commerce,

---

[65] Between 2012 and 2017, CGP purchased over 24,000 forgings from Silbo (a value of $3.2 million). R. Doc. 150 at 2. Of the 140 forgings in batch H-3501, CGP sold 50 tees to Louisiana customers. *Id.*

flowing as it did into Louisiana, that makes reasonable Silbo's anticipating being haled into court in Louisiana.

### 3. Fair and reasonable

As Silbo consistently argues, foreseeability alone has never been enough to establish personal jurisdiction under the stream-of-commerce theory. A court's exercise of personal jurisdiction must also be reasonable. *World-Wide Volkswagen*, 444 U.S. at 292. In weighing reasonableness, courts consider, *inter alia*, the defendant's burden. *Id.*; *Ruston Gas*, 9 F.3d at 421. Regardless, Silbo does not argue that personal jurisdiction is unreasonable or unduly burdensome. Rather, Silbo again relies on *Bristol-Myers* to assert that, in some instances, federal due process limits personal jurisdiction even where it would otherwise be reasonable to exercise jurisdiction.[66] But this long-standing and unremarkable proposition has no role in the instant case. Here, Silbo's purposeful availment of the forum by using the stream of commerce to import a product that allegedly caused harm in the forum gives rise to specific personal jurisdiction, **_unless_** such exercise of jurisdiction is found to be unfair or unreasonable.

Silbo has purposefully availed itself of the benefits of the Louisiana market through its insertion of the tees into a stream of commerce foreseeably ending in Louisiana, especially in light of Silbo's substantial sales within the forum and regular flow of business to the state. Thus, it is presumptively reasonable for Silbo to defend a suit in this market. *Burger King*, 471 U.S. at 473-74 ("[W]here individuals 'purposefully derive benefit' from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.") (quoting *Kulko v. Cal. Super. Ct.*, 436 U.S. 84, 96 (1978)); *World-Wide Volkswagon*, 444 U.S. at 297

---

[66] R. Doc. 157 at 18 n.11.

("[I]f the sale of a product of a manufacturer or distributor … is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."); s*ee also Luv N' Care*, 438 F.3d at 470 ("Where a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be amenable to suit in that state."). The forum state's interests are also considered in analyzing reasonableness. Louisiana courts acutely understand the potential for catastrophic harm to the state when failures occur in well operations and, thus, the state has a keen interest in enforcing regulations of goods in the oil-and-gas industry and related claims. *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014) (BP oil spill).

Principles of judicial economy and efficiency also support this Court's exercise of personal jurisdiction over third-party claims when this Court has already invested significant time and resources. CGP opposes Silbo's motion, wishing to keep the litigation in this forum, and the Court finds no undue burden on Silbo that would counsel the Court to override the forum state's and CGP's interests. *See Asahi*, 480 U.S. at 113 (factors in personal jurisdiction reasonableness analysis include "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief"). In fact, Silbo has not articulated any putative burdens. Silbo representatives travel from New Jersey to Louisiana to conduct business and likewise can travel to Louisiana to defend that business. Thus, this Court finds that its exercise of specific personal jurisdiction over Silbo is fair, reasonable, and comports with federal due process. Therefore, Silbo's motion to dismiss for lack of personal jurisdiction is denied.

### D.  Specific Jurisdiction Analysis – Gupta

CGP and Federal Flange also rely on a stream-of-commerce theory to support specific jurisdiction over Gupta, and they do not contend that Gupta is subject to general jurisdiction. Thus, the Court addresses only specific jurisdiction.  For the reasons discussed above, this Court again applies Fifth Circuit precedent in its analysis.

Because Gupta and Silbo were closely related in their business endeavors, the analysis of personal jurisdiction over Gupta largely tracks that of Silbo.  Gupta had a long-standing relationship with Silbo and was Silbo's sole supplier of cushion tees, although Defendants did not have an exclusive agreement.[67]  Gupta is an original manufacturer of tees and advertises on its website that it exports its goods to the United States.[68]  Gupta exports tees nationwide without restriction or limitation,[69] including regularly to Texas and Louisiana customers.[70]  Gupta purposefully availed itself of the Louisiana market by its repeated and direct sales to Louisiana customers through its importing relationship with Silbo.  Between 2010 and 2012, Gupta sold approximately $10.2 million worth of goods to Louisiana customers, through Silbo.[71]  Along with Silbo, Gupta visited Louisiana customers, to whom it sold its products, on more than one occasion to foster business relations.[72]  The tees, bearing batch number H-3501, were undisputedly manufactured by Gupta, traveled by way of Texas into Louisiana, and allegedly failed on a well off the coast of Louisiana, causing alleged harm to LLOG, CGP, and Federal Flange.  Thus, CGP and Federal Flange have also made a *prima facie* showing that Gupta delivered its tees "into the stream of commerce with the expectation that [they] would be

---

[67] R. Docs. 149-1 at 19; 165 at 2.
[68] R. Docs. 120-3 at 4; 165 at 2.
[69] R. Docs. 149 at 3; 149-2 at 19-20.
[70] *See supra* note 16.
[71] R. Doc. 149-2 at 15.
[72] *Id.* at 17-18.

purchased by or used by consumers in the forum state." *Ainsworth*, 716 F.3d at 177. Gupta, like Silbo, could expect its tees to end up in Louisiana, because it knew that thousands of its tees were purchased by Louisiana customers through Silbo.

Gupta, like Silbo, argues that it did not have specific knowledge of the distribution route of the tees from batch H-3501 or to whom CGP would resell them. But again, specific knowledge of destination or route is not required. Even without considering Gupta's known sales into Louisiana, Gupta reasonably should have expected that its tees would go to Louisiana, based upon Gupta's actual knowledge. Gupta's representative, Gaurav Gupta, testified in his deposition that he understood that Silbo's customers are not end users of Gupta's products.[73] Gaurav Gupta expressly stated that it is foreseeable that Gupta's products imported by Silbo could end up "anywhere,"[74] that its tees are used for oil-and-gas industry applications,[75] and that it knows Louisiana is a major center of oil-and-gas production.[76] Additionally, Gaurav Gupta knew that Silbo was selling Gupta's products to purchasers in Louisiana.[77] Despite this knowledge, Gupta never restricted or limited distribution or resale of its products in any way to limit risk of litigation in Louisiana.[78]

With the breadth and cumulation of Gupta's actual knowledge, Gupta, like Silbo, cannot now claim it did not reasonably expect its tees to wind up in Louisiana. Gupta knowingly and purposefully availed itself of the Louisiana market, both directly and indirectly, through streams of commerce enhanced by its relationship with Silbo. *See DePuy*, 888 F.3d at 779; *World-Wide Volkswagon*, 444 U.S. at 297. Gupta has substantially profited from the market in Louisiana and

---

[73] *Id.* at 17.
[74] *Id.* at 19.
[75] R. Docs. 120-3 at 3 (advertised on website); 149-2 at 4-5.
[76] R. Doc. 149-2 at 23.
[77] *Id.* at 6.
[78] *Id.* at 19-20; 150-1 at 14.

cannot now use federal due process as a shield from litigation of an allegedly defective product it injected into the forum. *See Burger King*, 471 U.S. at 473-74; *Choice Healthcare*, 615 F.3d at 373. Gupta's conduct has provided it sufficient notice that it may be haled into a Louisiana court in a matter related to its products, and therefore, it is subject to specific personal jurisdiction in this forum, so long as exercise of jurisdiction is not unfair or unreasonable.

As with Silbo, Gupta's tees reached Louisiana through regular streams of commerce intended to serve as broad of a market as possible rather than by unilateral acts of a consumer, or random "eddie," *Asahi*, 480 U.S. at 117, or the "fortuitous or attenuated contacts" of a third party, *Burger King*, 471 U.S. at 475 (internal quotations omitted). Therefore, it is presumptively reasonable for Gupta to be subject to personal jurisdiction in this forum.

Gupta does not argue that exercise of personal jurisdiction over it is unreasonable and articulates no specific hardships or burdens. Nonetheless, because Gupta is an Indian-based corporation, this Court recognizes the challenges of defending litigation internationally. Gupta, however, engaged in a regular course of exporting its tees internationally. Part of the cost of such business is the possibility of having to defend itself against product liability claims, even in far-flung places if reasonable for it to have anticipated those forums to be the destination of its products. *See Choice Healthcare*, 615 F.3d at 373. Moreover, Gupta representatives have previously traveled to Louisiana on business and can do so again for purposes of defending this litigation. CGP and Federal Flange seek to keep this litigation in this forum, where it has been litigated for over two years and resources have already been expended. Thus, this Court finds that exercise of specific personal jurisdiction over Gupta is fair, reasonable, and comports with federal due process. Therefore, Gupta's motion to dismiss for lack of personal jurisdiction is denied.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that Silbo and Gupta's motions to dismiss for lack of personal jurisdiction (R. Docs. 89 and 107) are **DENIED**.

New Orleans, Louisiana, this 27th day of August, 2019.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE